**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR04-4111-MWB |
| vs. | **MEMORANDUM ORDER AND OPINION REGARDING DEFENDANT'S SENTENCING MOTION IN LIMINE** |
| JESSE JOHN WENDELSDORF, | |
| Defendant. | |

---

**TABLE OF CONTENTS**

I. *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A. *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B. *Arguments Of the Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A. *Consideration Of Acquitted Conduct Post-***Booker** . . . . . . . . . . . . . . 5
    B. *Application To Defendant Wendelsdorf* . . . . . . . . . . . . . . . . . . . . 11

III. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

This matter comes before the court on the defendant's Sentencing Motion in Limine (Doc. No. 116), which requests the court exclude from its sentencing determination certain conduct of which the defendant was acquitted. Despite the fact that the defendant in this case has been acquitted of two different crimes, in two distinct judicial proceedings, in two different sovereigns—that is, a prior state court proceeding and this

criminal proceeding—the Government nevertheless seeks to exact its "pound of flesh" for these alleged criminal acts during the defendant's sentencing proceeding.◻[1] Essentially, this court is called upon to determine whether two levels of acquitted conduct can be used to enhance the defendant's sentence—namely, whether the conduct of which the defendant was acquitted in this criminal proceeding (Count 1) can first be considered relevant conduct to enhance the defendant's sentence and if so, if the conduct of which the defendant was acquitted in a separate state court proceeding may be used for further enhancement purposes. After a thorough review of the applicable facts and relevant case law, this court, much like Balthasar, refuses to reach such an irregular result by judicially endorsing the Government's attempt to bootstrap acquitted conduct, through the use of acquitted conduct as relevant conduct, into the factors this court will consider during the defendant's sentencing proceeding.

## I. INTRODUCTION

### A. Procedural Background

On December 15, 2004, Jesse John Wendelsdorf, the defendant, was indicted on two separate counts (Superseding Indictment, Doc. No. 7). Count 1 of the Indictment charged that, between January 1997, and continuing through January 2000, Wendelsdorf conspired with others to (1) maintain a residence for drug crimes; (2) manage a residence

---

[1]This reference is derived from William Shakespeare's *The Merchant of Venice*, act 4, sc 1. *The Merchant of Venice* is about a Jewish moneylender, Shylock, and his bond to extract a pound of flesh from, Antonio, the forfeiter of a debt. Shylock, when offered several times the debt (bond) refused, stating the bond was forfeit and that he demanded receipt of his "pound of flesh." *Id*. It was only through the rather creative reading of the law by Balthasar (a doctor of laws) that the result was avoided. *Id*.

and make it available for drug crimes; (3) distribute a methamphetamine mixture; and (4) possess a methamphetamine mixture with intent to distribute.  Count 2 of the Indictment charged that, between January 2001, and continuing through about November 25, 2003, Wendelsdorf conspired with others to  (1) manufacture actual (pure) methamphetamine; and (2) distribute actual (pure) methamphetamine.  A three-day jury trial commenced on August 15, 2005.  The jury acquitted Wendelsdorf of the first conspiracy (Count 1) and convicted him on the second conspiracy (Count 2) finding him responsible for 5 grams or more of actual (pure) methamphetamine.   Following the jury verdict, the defendant filed a Renewed Motion for Acquittal (Doc. No. 100), which this court summarily denied on October 6, 2005 (Doc. No. 109).  Thereafter, the defendant filed the Sentencing Motion in Limine (Doc. No. 116) that is currently before the court.  The defendant's Motion in Limine is predicated upon the Government's statement of offense conduct, dated September 30, 2005, which seeks to increase Wendelsdorf's sentence through consideration of certain charges of which Wendelsdorf has been acquitted.   The defendant's Motion in Limine seeks to exclude this evidence from the purview of this court during sentencing.

### B.  Arguments Of the Parties

Essentially, the Government argues that first, the drug quantity attributed to Wendelsdorf should be increased by computation of the additional amounts charged in Count 1 of the December 15, 2004 Superseding Indictment, even though Wendelsdorf was acquitted of this Count, because the first conspiracy and the quantities adduced therefrom constitute relevant conduct.  The Government takes its argument a step further, and alleges that the acceptance of this premise then permits the court to increase the defendant's offense level and consider an upward departure based on Wendelsdorf's alleged

involvement in the death of his then-girlfriend's child, Shelby Duis, which occurred during the time period charged in Count 1, even though Wendelsdorf was acquitted in state court of all charges surrounding the child's death.[2]  Essentially, the Government requests Wendelsdorf's Base Offense Level be increased from a Level 32 to a Level 43 and that is prior Criminal History Category be increased from a Category I to a Category III.  This would increase Wendelsdorf's Guidelines range from 121-151 months to Life, although under 21 U.S.C. § 841(b)(1)(B) the Government concedes Wendelsdorf can only be sentenced to a maximum of forty years imprisonment.  The Government seeks to present evidence during the sentencing in support of its requests.

In response, the defendant contends he was not only acquitted of the conspiracy charged in Count 1, but also acquitted of the murder and sexual abuse of Shelby Duis, and therefore, it is inappropriate for the court to consider such conduct in its sentencing determination.  In addition, even if the court is inclined to consider the acquitted conduct, the defendant argues the preponderance of the evidence standard that is applied where there are contested advisory United States Sentencing Guidelines issues is unconstitutional.  Rather, the defendant avers the protections endowed by the Fifth Amendment require that this court adopt a higher standard of proof—specifically, beyond a reasonable doubt— in determining Guidelines-issue facts during sentencing.  Accordingly, the defendant requests

---

[2]Shelby Duis died on January 4, 2000.  At the time of Duis's death, the defendant resided with Duis's mother, Heidi Watkins and her two children in Spirit Lake, Iowa.  Following the death of Duis, the defendant was charged with first-degree murder (Count 1), sexual abuse (Count 2) and child endangerment (Count 3).  Count 3 was dismissed by the district court at trial.  The defendant was acquitted of Counts 1 and 2 following a jury trial.  Heidi Watkins was also charged with murder and child endangerment.  She was convicted of child endangerment and is currently serving out her sentence on this conviction.

this court order the sentencing be based upon the findings made by the jury only in Count 2, the offense of the defendant's conviction.

## II. LEGAL ANALYSIS

The issues presented by Wendelsdorf's sentencing are both complex and varied. Accordingly, here the court will attempt to succinctly analyze the relevant sentencing issues and standards.

### A. Consideration Of Acquitted Conduct Post-Booker

*United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 756 (2005), a landmark opinion issued by the United Sates Supreme Court in 2005, substantially altered the sentencing regime that had existed since the promulgation of the United States Sentencing Guidelines on November 1, 1987. In *Booker*, the United States Supreme Court concluded that a sentencing court's imposition of an enhanced sentence under the Guidelines violates the Sixth Amendment where the sentence is based upon the finding of a fact (other than a prior conviction) not found by a jury or admitted by the defendant. *Id.* The constitutional infirmity arose by virtue of the mandatory nature of the Guidelines which imposed "binding requirements on all sentencing judges." *Id.* at 749-50. In effectuating a remedy, the Court stated that it had essentially two choices—require a jury to find any fact that would result in an enhanced sentence or make the sentencing Guidelines advisory in nature. *See id.* at 757. Thus, the Court was left to determine which approach would deviate the least from congressional intent. *Id.* The Court adopted the latter resolution because the former approach "would so transform the scheme that Congress created that Congress likely would not have intended the Act as so modified to stand." *Id.* at 759.

Thus, within the post-*Booker* era, courts must follow certain prescribed sentencing procedures. *United States v. Mashek*, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005); *United States v. Haack*, 403 F.3d 997, 1002 (8th Cir. 2005). First, the appropriate Guidelines sentencing range must be determined since that range is an important factor to be considered in the imposition of a sentence. *Id.* Once the applicable Guidelines range is determined, a court must consider whether a traditional departure is appropriate under Part K and § 4A1.3 of the Guidelines. *Id.* at 1002. However, because of the advisory nature of the Guidelines, "a reasonable departure is not limited solely to circumstances that the formerly mandatory guidelines framework would have deemed permissible bases for departure." *United States v. Hadash*, 408 F.3d 1080, 1083 (8th Cir. 2005) (noting that *Booker* excised the narrow requirements prescribing when a departure was warranted). However, a sentence that is calculated to include a formerly permissible departure will be "consistent with the now-advisory Guidelines and this is generally indicative of reasonableness." *United States v. Shannon*, 414 F.3d 921, 924 (8th Cir. 2005). These identified considerations result in a "Guidelines sentence." *Haack*, 403 F.3d at 1002. After a Guidelines sentence is attained, the court then must consider the factors set forth under § 3553(a) to determine whether to impose the calculated Guidelines sentence or a sentence outside that range. *Id.* While this procedure may appear, at first blush, to be straightforward, the precise contours of the Court's decision in *Booker* are not clearly delineated. Accordingly, the lower federal district and appellate courts have been left to determine the practical effects of the *Booker* decision. Long before the *Booker* metamorphosis, it was well-established that acquitted conduct could be considered at sentencing, so long as the acquitted conduct was proved by a preponderance of the

evidence. *United States v. Watts*, 519 U.S. 148 (1997).■[3]  The questions presented in this case, however, is whether the *Watts* decision fully survived *Booker*.

In *Watts*, the Court held that a jury's verdict of acquittal does not preclude consideration of conduct underlying the acquitted charge by a sentencing court, so long as the conduct has been proved by a preponderance of the evidence. *Id.* at 157. The Court explained that "'acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt.'" *Id.* at 155 (quoting *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984)). As such, "'an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof.'" *Id.* at 156 (quoting *Dowling v. United States*, 493 U.S. 342, 349 (1990)). The *Watts* decision was predicated on the rationale that "different standards of proof . . . govern at trial and sentencing." *Id.* at 155. At trial, a defendant is presumed innocent and his liberty has not been curtailed. Upon conviction, however, a defendant forfeits his or her liberty. This change in the attendant circumstances is the primary reason the Supreme Court has determined that the preponderance of the evidence standard comports with due process. "Once the reasonable-doubt standard has been applied to obtain a valid conviction, 'the criminal defendant has been constitutionally deprived of his liberty to the

---

[3]In *Watts*, the defendant was convicted of possessing cocaine with intent to distribute, but acquitted of using a firearm in the course of a drug offense. 519 U.S. at 149-50. Despite the acquittal on the firearms charge, the sentencing court applied an upward adjustment under the Sentencing Guidelines upon finding that the defendant had possessed the firearm during the offense of conviction by a preponderance of the evidence. *Id.* at 150. The Ninth Circuit reversed, concluding it was improper to consider acquitted conduct under any circumstances. *Id.* The United States Supreme Court reversed the Ninth Circuit and held acquitted conduct could be considered so long as it was proved by a preponderance of the evidence. *Id.* at 157.

extent that the State may confine him.'" *McMillan v. Pennsylvania*, 477 U.S. 79, 91 (1986) (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976)). In effect, upon conviction, a defendant has forfeited his or her liberty to the maximum period of time provided by the statute of conviction and may be constitutionally incarcerated for any period of time up to the maximum range. *See id.* "[I]f the state wishes to consider giving back some portion of that forfeited liberty, in the form of parole or a lesser sentence, that decision is a matter of grace, and does not necessitate procedural rights." Susan N. Herman*, Applying* Apprendi *to the Federal Sentencing Guidelines: You say You Want a Revolution?*, 87 *Iowa L. Rev.* 615, 638 (2002). Nothing in *Booker* undermined these principles.

Notably, the *Booker* decision did express some dissatisfaction with the cursory analysis given to the issues in *Watts*. For example, in a footnote, Justice Stevens characterized *Watts* as presenting "a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral argument. It is unsurprising that we failed to consider fully the issues presented to us in these cases." *Booker*, 125 S. Ct. at 754 n.4. Similarly, Justice Thomas's dissent raised concern over whether the preponderance standard satisfied minimal due process requirements:

> The commentary to § 6A1.3 states that "[t]he Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the Guidelines to the facts of a case." The Court's holding today corrects this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have lawfully been imposed on the basis of facts found by the jury or admitted by the defendant.

*Id.* at 798 n.6 (Thomas, J., dissenting). Presumably, however, any dissatisfaction with the

shortcomings contained in the *Watts* decision was relieved by rendering the Guidelines non-binding and advisory. Such an outcome is a logical extension of *Booker* because the constitutional infirmity identified therein did not arise merely from the operation of the lowered burden of proof at sentencing. Rather, the error arose because of the interaction between the lowered burden of proof coupled and the then-mandatory nature of the Guidelines. Although *Booker* technically was limited in its scope to the Sixth Amendment, it would seem, however, that the Court's remedy further alleviated the constitutional concerns identified by Justice Thomas with respect to the appropriate burden of proof under the Fifth Amendment. Essentially, this potential constitutional defect was cured because a person who is found guilty of a crime beyond a reasonable doubt is exposed to the maximum punishment permitted by the statute of conviction, as opposed to the maximum allowed under the Guidelines. Therefore, because a convicted defendant has forfeited his liberty accordingly, it is therefore constitutional to impose a sentence anywhere within that range when based on facts proved only by a preponderance. The majority of courts addressing this issue have concluded likewise. *See United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005); *United States v. Price*, 418 F.3d 771, 788 (7th Cir. 2005); *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. ), *cert. denied*, 126 S. Ct. 468 (2005); *United States v. Duncan*, 400 F.3d 1297, 1304-05 (11th Cir. ), *cert. denied*, 126 S. Ct. 432 (2005); *United States v. Gray*, 362 F. Supp. 2d 714, 723-24 (S.D. W. Va. 2005); *but see United States v. Kwame Okai*, No. 4:05CR19, 2005 WL 2042301, at *10 (D. Neb. Aug. 22, 2005); *United States v. Coleman*, 370 F. Supp. 2d 661, 669-673 (S.D. Ohio 2005); *United States v. Pimental*, 367 F. Supp. 2d 143, 152 (D. Mass. 2005). Thus, under this framework, a sentencing court, even in the post-*Booker* regime, may consider acquitted conduct in its sentencing determination, so long as such conduct is proved by a preponderance of the evidence. This conclusion is in accord with recent

Eighth Circuit guidance on the issue albeit outside the context of consideration of acquitted conduct. *See United States v. Wade*, 435 F.3d 829, 831 (8th Cir. 2006) (noting the district court was "free to consider any sentencing facts supported in the record by a preponderance of the evidence in setting [the defendant's] sentence"); *United States v. Vaughn*, 410 F.3d 1002, 1004 (8th Cir. 2005) ("[T]he remedial opinion in *Booker* held that such judicial fact-finding [by the preponderance of the evidence] for sentencing proposes does not violate the Sixth Amendment when made as part of an advisory Guidelines regime."), *cert. denied*, 126 S. Ct. 1103 (2006); *see also United States v. Patient Transfer Serv., Inc.*, 413 F.3d 734, 745 (8th Cir. 2005) ("[T]he Supreme Court maintained the trial court's fact finding authority without setting a new standard [in *Booker*"); *United States v. Pirani*, 406 F.3d 543, 551 n.4 (8th Cir. ) ("Nothing in *Booker* suggests that sentencing judges are required to find sentencing-enhancing facts beyond a reasonable doubt under the advisory Guidelines regime.") (citing U.S.S.G. § 6A1.3, cmt.; *United States v. Mares*, 402 F.3d 511, 519 & n.6 (5th Cir. 2005)), *cert. denied*, 126 S. Ct. 266 (2005).◻[4]

---

[4]Despite the Eighth Circuit's guidance on this issue, the debate over the applicable standard of proof at sentencing rages on, at least within the District of Nebraska. Judge Bataillon, a Federal District Court Judge in the District of Nebraska, has determined that judicial fact-finding during sentencing requires the application of a "beyond a reasonable doubt" standard. *United States v. Kwame Okai*, 2005 WL 2042301, at *10. In *Kwame Okai*, Judge Bataillon recognized the Eighth Circuit's conclusion in *Pirani*, 406 F.3d at 551 n.4, that *Booker* does not require sentencing judges to find sentence-enhancing facts beyond a reasonable doubt but declined to follow that guidance based on his conclusion that the Fifth Amendment requires application of a beyond a reasonable doubt standard. *Id.* at *7 n.5, *10. Judge Bataillon reasoned that *Booker* did not address the Fifth Amendment issue and that the defendant in *Pirani* failed to preserve a claim under the Fifth Amendment by raising an *Apprendi* objection. *Id.* at *7 n.5. Thus, Judge Bataillon felt his construction of the statute was required in order to avoid a constitutional infirmity based on the Due Process Clause. *Id.* at *10. Following Judge Bataillon's opinion in

(continued...)

## B. Application To Defendant Wendelsdorf

In this case, the Government requests that this court consider Count 1, the conspiracy of which Wendelsdorf was acquitted, as relevant conduct. If Count 1 is considered, the Government requests further enhancement of Wendelsdorf's offense level based on his living arrangement with Watkins and her two children and his alleged involvement in the death and sexual abuse of Shelby Duis. This court refuses to endorse the Government's attempt to reach conduct of which the defendant was acquitted in state court (the events surrounding Shelby Duis's murder) by bootstrapping that conduct to additional acquitted conduct in his federal criminal case (Count 1). This court presided over the defendant's trial on the merits and had the opportunity to examine and evaluate,

---

[4](...continued)

*Kwame Okai*, Judge Kopf, also a Federal District Court Judge in the District of Nebraska, issued an opinion in which he concluded that Judge Bataillon's "'constitutional avoidance'" argument was a "'strawman.'" *United States v. Coney*, 390 F. Supp. 2d 844, 851 n.15 (D. Neb. 2005). In concluding application of the preponderance of the evidence standard during sentencing determinations was appropriate, Judge Kopf stated "it would border on the perverted for the Supreme Court to discover a previously unknown Fifth Amendment right to 'proof beyond a reasonable doubt' at federal sentencing proceedings using an advisory Guidelines system when the [J]ustices failed to articulate such a right in *Booker*, *Blakely* or *Apprendi*." *Id*. Thus, as this court acknowledged in its preceding discussion, the debate continues with respect to this issue to some degree, even among courts within the Eighth Circuit. However, this court is in agreement with Judge Kopf as previously indicated and concludes sentence-enhancing facts typically are only required to be proved by a preponderance of the evidence. Recent Eighth Circuit jurisprudence further compels this result, and indeed, has probably put the debate to rest. *See United States v. Adema*, No. 05-2322, 2006 WL 335439, at *1 (8th Cir. Feb. 15, 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the guidelines are applied in an advisory manner."); *United States v. Burgess*, No. 05-2526, 2006 WL 387442, at *2 (8th Cir. Feb. 21, 2006) (reversing and remanding for resentencing based upon district court's application of reasonable doubt standard in determining drug quantity).

11

firsthand, the testimony and evidence presented at trial. Based on the evidence presented at trial, the jury concluded the Government had failed to prove its case beyond a reasonable doubt as to Count 1. This court agrees wholeheartedly with the jury's conclusion and after a review of the evidence presented further concludes the Government failed to prove its case by a preponderance of the evidence. Therefore, it would be a violation of constitutional proportions under *Watts* and a plethora of other federal court decisions that require proof by a preponderance of the evidence, both pre- and post-*Booker*, for this court to consider Count 1 as relevant conduct during the defendant's sentencing. Because the court's conclusion precludes consideration of the conduct charged in Count 1 as relevant conduct, neither will the court consider any further enhancement of the defendant's offense level based on his alleged involvement in the death of Shelby Duis during this same time period.

Second, this court notes that nothing in *Watts* mandates consideration of acquitted conduct. The language used in *Watts* is merely permissive, not authoritative. *See Watts*, 519 U.S. at 154 (holding "a sentencing court *may* consider conduct of which a defendant has been acquitted," but not mandating such a consideration); *see also id.* at 157 (holding "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"). The problem the Supreme Court had with the Ninth Circuit's decision in *Watts* was the circuit court's broadly-stated conclusion that a sentencing court could never, under any circumstances whatsoever, consider acquitted conduct because such a consideration led to an impermissible reconsideration of "facts that the jury necessarily rejected by its acquittal of the defendant on another count." *United States v. Watts*, 67 F.3d 790, 796 (9th Cir. 1995). The Supreme Court noted that such a blanket prohibition against considering acquitted conduct reflected an erroneous view of

the Court's double jeopardy jurisprudence. *Watts*, 519 U.S. at 154. However, although the Supreme Court rejected the Ninth Circuit's sweeping prohibition against consideration of acquitted conduct at sentencing, the Court did not go so far as to mandate consideration of that conduct in all cases where it is proved by a preponderance of the evidence. *See id.* Consequently, although a sentencing court *may* consider acquitted conduct proved by a preponderance of the evidence, nothing in *Watts*, at least as it is interpreted by this court, requires a sentencing court to do so, and in its discretion, a sentencing court may refuse to consider or give absolutely no weight to the acquitted conduct. Rather, it would appear that the preponderance of the evidence standard merely provides the threshold basis required by the Constitution. This interpretation of *Watts* and its progeny is bolstered by an observation in the *Watts* opinion. *Watts* acknowledged a growing body of case law that has excluded from the purview of the sentencing court consideration of acquitted conduct proved by a preponderance of the evidence in extreme circumstances. Specifically, *Watts* recognized that there was "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." *Id.* at 156 (citing *McMillan*, 477 U.S. at 88 (upholding use of preponderance standard where there was no allegation that the sentencing enhancement was "a tail which wags the dog of the substantive offense"); *Kinder v. United States,* 504 U.S. 946, 948-949 (1992) (White, J., dissenting from denial of certiorari) (acknowledging split); *United States v. Kikumura,* 918 F.2d 1084, 1102 (3d Cir. 1990) (holding that clear-and-convincing standard is implicit in 18 U.S.C. § 3553(b), which requires a sentencing court to "find" certain facts in order to justify certain large upward departures; not reaching the due process issue; *United States v. Gigante,* 39 F.3d 42, 48 (2d Cir. 1994), *as amended*, 94 F.3d 53, 56 (1996) (not reaching due process issue; "In our view, the preponderance standard is no more than a *threshold* basis for adjustments

and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures. . . . Where a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly"); *United States v. Lombard*, 72 F.3d 170, 186-187 (1st Cir. 1995) (authorizing downward departure in "an unusual and perhaps a singular case" that may have "exceeded" constitutional limits, where acquitted conduct calling for an "enormous" sentence enhancement" is itself very serious conduct," "where the ultimate sentence is itself enormous, and where the judge is seemingly mandated to impose that sentence"); *United States v. Townley,* 929 F.2d 365, 369 (8th Cir. 1991) ("At the very least, *McMillan* allows for the possibility that the preponderance standard the Court approved for garden variety sentencing determinations may fail to comport with due process where, as here, a sentencing enhancement factor becomes 'a tail which wags the dog of the substantive offense'"); *United States v. Restrepo*, 946 F.2d 654, 656, n.1 (9th Cir. 1991) (en banc) (suggesting that clear-and-convincing evidence might be required for extraordinary upward adjustments or departures); *United States v. Lam Kwong-Wah*, 966 F.2d 682, 688 (D.C. Cir. 1992) (same); *United States v. Trujillo*, 959 F.2d 1377, 1382 (7th Cir. 1992) (same), but further citing, as contrary authority, *United States v. Washington*, 11 F.3d 1510, 1516 (10th Cir. 1993) ("At least as concerns making guideline calculations the issue of a higher than a preponderance standard is foreclosed in this circuit")).◘[5] Unfortunately, the *Watts* Court

---

[5]This body of lower court decisions originates out of *McMillan v. Pennyslvania*, a United States Supreme Court decision in which the Court upheld application of the preponderance of the evidence standard because there was no allegation that the sentencing enhancement was "a tail which wags the dog of the substantive offense." 477 U.S. at 88. This language implies, of course, that under certain circumstances, a sentencing
(continued...)

declined to explicitly address the issue of under what, if any, circumstances a higher burden of proof ought to be applied because it did not believe that the facts of the cases before it presented such "exceptional circumstances." *Id.* at 157. Importantly, however, in its collation of cases in which circuit courts had deemed it appropriate to apply a higher evidentiary standard in light of extreme circumstances, the Supreme Court cited *United States v. Townley*, an Eighth Circuit case. In *Townley*, the Eighth Circuit left open the question of whether a clear and convincing evidence standard was applicable in extreme situations because the Government's evidence could not withstand scrutiny even under the preponderance standard applied to typical cases. 929 F.2d at 365. However, in its decision in *Townley*, the Eighth Circuit did cite favorably the Third Circuit's decision in *United States v. Kikumura*, 918 F.2d at 1101 and quoted the case extensively:

> In *Kikumura,* the Guidelines dictated a range of twenty-seven to thirty-three months imprisonment (level 18) for passport offenses and possession of explosives. However, upon finding that the defendant acquired the explosives as an international terrorist and planned to kill large numbers of people, the district court departed upward and imposed a sentence of thirty years (equivalent to level 40). The Third Circuit concluded: This is perhaps the most dramatic example imaginable of a sentencing hearing that functions as "a tail which wags the dog of the substantive offense." *McMillan,* 477 U.S. at 88, 106 S. Ct. at 2417. In this extreme context, we believe, a court

---

[5](...continued)
enhancement factor could become "a tail which wags the dog of the substantive offense," thereby warranting application of a different standard of proof. *Booker* also suggests there is merit to this argument because Justice Stevens implicitly attempted to narrow *Watts*'s scope in *Booker*: "*Watts* presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not have the benefit of full briefing or oral argument. It is unsurprising that we failed to consider the issues presented to us in these cases. 125 S. Ct. at 754 (citing *Watts*, 519 U.S. at 171 (Kennedy, J., dissenting)).

> cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations. *Id.* at 1100-01. The court went on to hold that, under these circumstances, due process requires clear and convincing evidentiary support for the facts relied upon to enhance the sentence. *Id.* at 1102.

*Id.* Later, in *United States v. Galloway*, 976 F.2d 414 (8th Cir. 1992), the Eighth Circuit again cited *Kikumura* favorably, although ultimately determining the court was not confronted with "an increase of *Kikumara*'s magnitude ." *Id.* at 426. Thus, it appears that both the Supreme Court and the Eighth Circuit endorse at a minimum, application of the clear and convincing evidence standard of proof before acquitted conduct may be considered in situations where the "tail wags the dog of the substantive offense." *See McMillan*, 477 U.S. at 88; *see also United States v. Thompson*, 51 F.3d 122, 125 (8th Cir. 1995) (noting application of the heightened standard was not warranted under the facts of the case, but failing to foreclose such a possibility in other cases). Other circuit courts have likewise concluded as such. *See United States v. Paster*, 173 F.3d 206, 216 (3d Cir. 1999) (holding the clear and convincing evidence standard was required for a nine-level upward departure for extreme conduct but ultimately concluding the heightened standard was met); *Trujillo*, 959 F.2d 1377, 1382 (7th Cir. 1992) (extreme disparity between sentence received and sentence for charged crime may require increased due process protections at sentencing); *United States v. Mobley*, 956 F.2d 450, 456 (3d Cir. 1992) ("*McMillan* leaves open the possibility that sentencing factors may cause "disproportionate impact"); *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) (holding district court erred in failing to apply the clear and convincing evidence standard to an enhancement that resulted in a seven-level increase); *Restrepo*, 946 F.2d at 659 (if sentencing factor has "extremely disproportionate effect," due process may require proof

by more than a preponderance of the evidence).  Ultimately, however, the applicability (or lack thereof) of such a heightened standard of proof has neither been definitively decided by the Supreme Court, nor the Eighth Circuit.  Based on the dicta contained in *McMillan* and the Eighth Circuit's implicit endorsement of a heightened standard when appropriate in *Galloway* and *Townley*, it appears that unique circumstances may permit a district court to exercise its discretion to not consider relevant acquitted conduct even if such conduct is proved by a preponderance of the evidence.

Thus, the question remains, is Wendelsdorf's case such a case?  In the opinion of this court, the answer is a resounding yes.  The conclusion that Wendelsdorf's case is a case where "the tail wags the dog of the substantive offense" is evinced by the Government's stated intention of conducting what this court sees as a "mini-trial" during the sentencing proceeding on an unrelated state charge of which the defendant was acquitted and obtain a Guidelines range in excess of the maximum penalty allowed by statute.  More specifically, the Government seeks to increase Wendelsdorf's Advisory Guidelines Range from 121-151 months to life.  This is a substantial increase in his Advisory Guidelines Range, exceeding even the maximum statutory punishment for Wendelsdorf's offense of conviction.  Additionally, other unique circumstances bolster the court's conclusion that this is precisely the type of case *McMillan* and its progeny intended to reach.  First, the Indictment charged two distinct conspiracies in two separate counts.  The conspiracy alleged in Count 1 occurred prior to the conspiracy charged in Count 2 and in a different location.  Further, the Count 1 conspiracy had distinct objectives and members from the conspiracy charged in Count 2.  Thus, the facts that the Government seeks to have this court consider are *not* facts enhancing the crime of conviction, like the presence of a gun or the vulnerability of the victim.  Rather, they are facts comprising different crimes, each in a different count and involving distinct conspirators and objective.

Second, the Government's objective is not just limited to the acquitted conduct in Count 1. Rather, the Government contends this court should consider enhancing the defendant's sentence based on the defendant's alleged involvement in the death and sexual abuse of Shelby Duis, crimes of which the defendant was also previously acquitted in a separate state court proceeding. Thus, in sum, the Government desires to increase Wendelsdorf's sentence by bootstrapping the conduct of which Wendelsdorf was acquitted in state court—the murder and sexual abuse of Duis—to further acquitted conduct as relevant conduct—the conduct Wendelsdorf was acquitted of in this federal criminal proceeding. Such a result, in the eyes of this court, is untenable. In its discretion, this court will not allow the Government—having failed to meet its burden of proof not just once, but twice at trial—to get a second bite at the apple for two, distinct and separate, criminal acts from the offense of conviction. In the eyes of this court, such a result is an abomination of the Guidelines and merely an attempt by the Government to relitigate and perfect its previously lost cases. For these reasons, even if the Government had proved Count 1 by a preponderance of the evidence, this court would exercise its discretion to not consider the relevant acquitted conduct in accordance with the dicta in *McMillan*, *Townley* and *Galloway* and in light of the liberty interest at stake and the risk of error inherent in a lower burden of proof.

In the alternative, if this court is mandated by *Watts* to consider relevant acquitted conduct proved by a preponderance of the evidence, then this court would opt to adopt the approach of the Second Circuit to achieve the same result. Within the Second Circuit, in cases where acquitted or uncharged conduct is proved by a preponderance, but not by clear and convincing evidence, and the circumstances are extreme, then a sentencing court metes out the upward departure in accordance with *Watts*, but departs downwardly in the same exact amount of the upward departure. For example, in *United States v. Gigante*, 94 F.3d

53 (2d Cir. 1996), the Second Circuit crafted the following test for upward adjustments and upward departures: "[T]he preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures." *Id.* at 56. The court proceeded to address downward departures and stated: "Where a higher standard appropriate to a substantially enhanced sentence range is not met, the court should depart downwardly. Because the risk of factual error in a series of adjustments, each of which involves conduct prove[d] by a bare preponderance, is a circumstance present at least 'to a degree' not adequately considered by the Commission, a downward departure should be warranted." *Id.* The Second Circuit reiterated its position on this issue in *United States v. Cordoba-Murgas*, 233 F.3d 704 (2d Cir. 2000). There, the Second Circuit formulated the following circumstances that must be present in order to warrant a downward departure: "(i) an enormous upward departure adjustment (ii) for uncharged conduct (iii) not proved at trial and (iv) found only by a preponderance of the evidence, (v) where the court has substantial doubts as to the accuracy of the finding." *Id.* at 709. Although *Cordoba-Murgas* dealt with uncharged conduct, the Second Circuit has applied these same principles to acquitted conduct.◻[6] *See United States v. Concepcion*, 983 F.2d 369, 389 (2d Cir. 1992) ("[W]e

_____

[6]This distinction, or rather, the lack thereof, between acquitted conduct and uncharged conduct arises, at least in part, from the Supreme Court's cursory treatment of the issue in *Watts*, which failed to distinguish between uncharged and acquitted conduct. In his dissent in *Watts*, Justice Kennedy pointed out these shortcomings in the majority opinion:

> We have not decided a case on this precise issue, for it involves not just prior criminal history but conduct underlying a charge for which the defendant was acquitted.

(continued...)

doubt that, with respect to conduct of which the defendant was acquitted, the Commission intended so extreme an increase."). Indeed, *Cordoba-Murgas* cited to *Concepcion*, as well as to *Gigante*, as support for the requirement of a finding of enormous relevant conduct, and commented, with respect to *Concepcion*, that the *Concepcion* court held that "the district court retains discretion to downwardly depart where the sentence would be dramatically increased by reason of the unconvicted relevant conduct." *See Cordoba-Murgas*, 233 F.3d at 709 (citing *Concepcion*, 983 F.2d at 389). In a subsequent opinion from the Eastern District of New York, Judge Block recognized this confusion regarding the distinction between uncharged and acquitted conduct. Judge Block believed that

---

[6](...continued)

> At several points the *per curium* opinion shows hesitation in confronting the distinction between uncharged conduct and conduct related to a charge for which the defendant was acquitted. The distinction ought to be confronted by a reasoned course of argument, not by shrugging it off. At the least it ought to be said that to increase a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal, concerns noted by Justice Stevens and the other federal judges to whom he refers in his dissent. If there is no clear answer but to acknowledge a theoretical contradiction from which we cannot escape because of overriding practical considerations, at least we ought to say so.

*Id.* at 170-171 (Kennedy, J., dissenting). These subtle nuances were presumably glossed over in *Watts*, because as noted by Justice Stevens in *Booker*, *Watts* "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not have the benefit of full briefing or oral argument. It is unsurprising that we failed to consider the issues presented to us in these cases." *Booker*, 125 S. Ct. at 754 (citing *Watts*, 519 U.S. at 171 (Kennedy, J., dissenting)).

> where *acquitted* conduct produces the same sentencing result
> as if the defendant had been convicted of that conduct, or
> significantly increases the Guidelines range, downward
> departure is invariably warranted. Where, however, relevant
> *uncharged* conduct is entailed, the authority to depart
> downward would continue to be governed by the nonexclusive
> factors set forth in *Cordoba-Murgas*. The extent of all
> departures in either situation will vary with the particular set
> of circumstances of each case and, as in all departure
> scenarios, would be "largely left to the sentencing court's
> discretion."

*United States v. Koczuk*, 166 F. Supp. 2d 757, 762-63 (E.D.N.Y. 2001) (quoting *Cordoba-Murgas*, 233 F.3d at 709). Thus, in the event *Watts* mandates consideration of acquitted conduct proved by a preponderance of the evidence, this court, in light of the weight of the Government's evidence, would authorize the upward departure, but then, under 18 U.S.C. § 3553(b), simultaneously would authorize a downward departure in the same amount pursuant to the Second Circuit's guidance on this issue. *See United States v. Outen*, 286 F.3d 622, 627 n.1 (2d Cir. 2002); *United States v. Norris*, 281 F.3d 357, 361-62 (2d Cir. 2002); *Cordoba-Murgas*, 233 F.3d at 709; *Concepcion*, 983 F.2d at 389; *Koczuk*, 166 F. Supp. 2d at 762-63; *see also United States v. Sturdivant*, 100 Fed. Appx. 23, 24-25 (2d Cir. 2004) (concluding district court did not err in imposing upward adjustment based on the relevant acquitted conduct, and then departing downward by exactly that same amount).

In a strikingly similar case to the one before this court, the First Circuit reached a similar result. *See Lombard*, 72 F.3d at 186. In *Lombard*, the defendant had previously been acquitted of murder in state court. *Id.* at 179. Following the acquittal, the federal

government brought charges against the defendant for firearms possession.◼[7] *Id.* The defendant was convicted of the federal firearms offense, and he received a life sentence because the sentencing court enhanced his sentence based on the district court's finding that the defendant committed murder by a preponderance of the evidence. *Id.* On appeal, the

---

[7]The opinion reflects a concern, which this court shares in this case, regarding the reality of the charges brought against the defendant:

> The federal prosecution followed on the heels of the acquittal. As the particular murders at issue were outside the sphere of the federal prosecutor's criminal charging power as to murder, Lombard was not charged with murder in the federal indictment; the murders themselves were not alleged by the government to be an object of the defendants' conspiracy; and the federal jury was required to make no factual determination regarding the commission of the murders. Yet it would ignore reality not to recognize that the federal prosecution arose out of and was driven by the murders, and that the prosecution was well aware that the Sentencing Guidelines would require consideration of the murders at sentencing.

*Lombard*, 72 F.3d at 179. This reality, which exists in the case before this court, is disconcerting. Through post-trial adjudication, under a lower standard of proof, the federal government potentially could obtain the very conviction that the Iowa state prosecutors attempted, but failed to obtain. Although the Guidelines allow such a result, as the *Lombard* court pointed out:

> Given the magnitude of the sentence "enhancement," the seriousness of the "enhancing" conduct in relation to the offense of conviction, and the seemingly mandatory imposition of the life sentence, this summary process effectively overshadowed the firearms possession charge and raises serious questions as to the proper allocation of the procedural protections attendant to trial versus sentencing.

*Id.* at 180.

First Circuit vacated the defendant's life sentence and remanded for resentencing because the district court failed to consider whether a downward departure would have been appropriate in light of the extreme circumstances presented. *Id*. at 187. The First Circuit provided an eloquent summation of its concerns, many, if not all, of which also have applicability to Wendelsdorf's case:

> The case presents difficult and delicate issues, not now susceptible of articulation through general rules. Our concerns have arisen from a situation where acquitted conduct calling for a challenged sentence increase is itself very serious conduct, substantively more serious than the offense with which the defendant was charged, where consideration of that conduct resulted in an enormous increase in sentence (including possibly beyond the sentence that would have been imposed for a conviction), where the ultimate sentence is itself enormous, and where the judge is seemingly mandated to impose that sentence. Such a situation increases the risk that what the judge is required to and in fact is sentencing the defendant for is not the convicted offense as enhanced by relevant conduct, but directly for conduct as to which the defendant has not been charged, tried by a jury, nor convicted on proof beyond a reasonable doubt.

*Id*. at 186. The First Circuit noted the unusualness of the "perhaps singular case," and cautioned that it did not provide an open door or invitation to litigate constitutional or departure issues in usual cases. *Id*. at 187. However, in the case now before the court, the similarities between the defendant in *Lombard* and Wendelsdorf are haunting. These similarities suggest that Wendelsdorf's case is a novel one, warranting a unique application of the law, much like Balthasar was forced to do in Shakespeare's *Merchant of Venice*. Both *Lombard* and the case currently before the court reside "at the boundaries of constitutional sentencing law," where the unique facts present a whole greater than the sum of its parts. *Id*. The existence of these nonpareil facts isolate both Lombard's and

Wendelsdorf's cases, from a constitutional perspective, from myriad other cases that have involved facially similar issues. *Id.* at 185, 187. Accordingly, this court concludes that the approach adopted by the First and Second Circuits is a mechanism that is also open to Wendelsdorf in light of the seemingly unparalleled circumstances surrounding his case. Under this framework, a downward departure would be unquestionably authorized, required and granted.

The availability of such a result as promulgated by the Second Circuit is bolstered in this post-*Booker* era of sentencing. The post-*Booker*, advisory Guidelines regime is conceptually an entirely different scheme from the system that existed when *Watts* was decided. The sentencing scheme that exists after *Booker* is not a return to the pre-Guidelines era of untrammeled discretion, yet it is unquestionably less restrictive than the previous mandatory Guidelines regime. The current post-*Booker* sentencing scheme resides, then, somewhat uncomfortably, between indeterminate and determinate sentencing schemes. This is so because after *Booker* a sentencing court must continue to calculate and consider the Guidelines range, but is not bound by it. Thus, as Justice Stevens pointed out in his dissent, the question faced by sentencing judges is how much confidence should be placed in the advice of the Guidelines? *Booker*, 125 S. Ct. at 787-88 (Stevens, J., dissenting in part). Accordingly, although the preponderance of the evidence standard continues to govern judicial fact-finding during sentencing, the reasonable-doubt standard can still operate as a measurement of reliability in determining how much deference to give the applicable Guidelines range. Judge Goodwin, in a remarkably well-reasoned opinion, also recognized that the reasonable doubt standard presents a useful tool for weighing the strength of and measuring the degree of certainty that is placed in the Guidelines advice. *See Gray*, 362 F. Supp. 2d at 723-24. In *Gray*, Judge Goodwin determined that he would compare the Guidelines range rendered by consideration of the conduct proved by a

preponderance of the evidence with the Guidelines range formulated by consideration of the conduct proved only beyond a reasonable doubt. *Id.* at 723. Although the additional consideration would not be binding, Judge Goodwin recognized that it would assist judges in weighing the reliability of the advice provided by the Guidelines and inform the exercise of judicial discretion in fashioning an appropriate sentence. *Id.* Judge Goodwin's opinion depicts the following, uncannily similar scenario:

> In many cases, the reasonable-doubt range will simply overlap exactly with the advisory Guideline range, and will give me enhanced confidence in sentencing determinations based on the Guideline advice. In other cases, however, there may be drastic differences between the two ranges. For example, envision a scenario in which the advisory Guideline range for a drug offense is 324-405 months. Further, imagine, based solely on findings made by a reasonable doubt at the sentencing hearing, that the range would be only 100-125 months. This disparity becomes apparent only when the reasonable-doubt standard is employed as an advisory tool. While this disparity is not strictly determinative of the ultimate sentence, it certainly indicates a much larger risk of factual error underlying the advisory Guideline calculations. Recognition of this disparity therefore helps me to determine the appropriate degree of deference that I should give to the Guideline Advice.

*Id.* at 723-24. This court agrees with Judge Goodwin's reasoning. In this case, assuming the Government had proved Count 1 by a preponderance of the evidence at sentencing (and subsequently proved Wendelsdorf's involvement in the Duis murder by a preponderance in addition), a massive disparity would exist between the Guidelines range rendered based on conduct found by only a preponderance of the evidence as opposed to conduct found beyond a reasonable doubt. This large disparity would indicate, in the eyes of this court, that the resulting Guidelines range would be entitled to an extremely low degree of

deference. Accordingly, the court's exercise of its discretion would be so informed as it determined an appropriate sentence in light of the advisory Guidelines range and §§ 3553(a) and (b). Taken together, a downward departure, in an amount equal to any upward adjustments sought by the Government would be justified and imposed in order to obtain a reasonable sentence, thereby resulting in neither a net gain nor a net loss in Wendelsdorf's sentence via consideration of the acquitted conduct. Consequently, even if *Watts* requires this court to consider the acquitted conduct and apply the requisite enhancements, a downward departure in the same amount would be authorized thereby neutralizing the effects of any upward adjustment. The availability of this result existed pre-*Booker*, and the post-*Booker* advisory Guidelines regime reinforces the viability of this option to sentencing courts and in this case begs its application.

### III. CONCLUSION

Based on the foregoing discussion, the court **grants** the defendant's Sentencing Motion in Limine. This court presided over the defendant's trial and had the opportunity to listen to the evidence and judge the credibility of witnesses firsthand. Based on the court's firsthand knowledge and subsequent review of this evidence, the court is left with the conviction that the Government has not proved Count 1 by a preponderance of the evidence. Further, even if the Government had proved its case by a preponderance of the evidence, this court would exercise its discretionary powers and not consider the acquitted conduct for the previously mentioned reasons. Finally, if the court is required to consider the acquitted conduct and apply the appropriate upward adjustments and departures, a downward departure in the same amount would be authorized under the circumstances presented in this case, effectively vitiating any net gain to the defendant's term of incarceration. Therefore, during the defendant's sentencing, the court will not consider

additional evidence with respect to the acquitted charges.

**IT IS SO ORDERED.**

**DATED** this 24th day of March, 2006.

_(signature: Mark W. Bennett)_

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA