## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESSE JOHN WENDELSDORF,<br><br>Defendant. | No. CR04-4111-MWB<br><br>**MEMORANDUM OPINION AND ORDER REGARDING THE DEFENDANT'S OFFENSE LEVEL** |

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *A. The Defendant's Base Offense Level* . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *B. Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        *1.    The defendant's arguments for exclusion* . . . . . . . . . . . . . . . 7
        *2.    The government's arguments for inclusion* . . . . . . . . . . . . . 9
    *C. Application To Defendant Wendelsdorf* . . . . . . . . . . . . . . . . . . . . . . 9
        *1.    The anhydrous ammonia tank* . . . . . . . . . . . . . . . . . . . . . . 9
        *2.    Quantity attributed to the defendant by Jason Storey's testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        *3.    Unreliable testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

In the course of engaging in statutory interpretation, Justice William O. Douglas observed, "[C]ommon sense often makes good law." *Peak v. United States*,

353 U.S. 43, 46 (1957). This court believes that common sense also makes good law in the interpretation of the United States Sentencing Guidelines, particularly Guideline § 2D1.1 and the court's responsibility to approximate the drug quantity that will be attributed to a particular defendant at sentencing. The fighting issue between the parties in this case is namely, whether unusable or tainted precursor chemicals may be utilized to increase a defendant's applicable offense level. When viewed from a common sense perspective, it is clear to this court, that only one conclusion can be rendered.

## I. INTRODUCTION AND BACKGROUND

On December 15, 2004, Jesse John Wendelsdorf, the defendant, was indicted on two separate counts (Superseding Indictment, Doc. No. 7). Count 1 of the Indictment charged that, between January 1997, and continuing through January 2000, Wendelsdorf conspired with others to (1) maintain a residence for drug crimes; (2) manage a residence and make it available for drug crimes; (3) distribute a methamphetamine mixture; and (4) possess a methamphetamine mixture with intent to distribute. Count 2 of the Indictment charged that, between January 2001, and continuing through about November 25, 2003, Wendelsdorf conspired with others to (1) manufacture actual (pure) methamphetamine; and (2) distribute actual (pure) methamphetamine. A three-day jury trial commenced on August 15, 2005. The jury acquitted Wendelsdorf of the first conspiracy (Count 1) and convicted him on the second conspiracy (Count 2) finding him responsible for 5 grams or more of actual (pure) methamphetamine.[1] Following the jury verdict, the defendant filed

---

[1] With respect to the count of conviction, Count 2, the evidence introduced at trial revealed that the defendant and his then-girlfriend, Judy Laue, were involved in a scheme in which they procured various precursors for two methamphetamine cooks, Jason Storey and Joel Storey, in exchange for a portion of the methamphetamine yielded from the Storey
(continued...)

2

a Renewed Motion for Acquittal (Doc. No. 100), which this court summarily denied on October 6, 2005 (Doc. No. 109). The defendant proceeded to sentencing on September 13, 2006.

The Presentence Investigation Report ("PSIR") prepared for the defendant's sentencing scored the defendant's total offense as 34 and his criminal history category as I, which established an advisory sentencing guideline range of 151 to 188 months. The PSIR arrived at these calculations based on a total drug quantity level of 244.93 grams of actual methamphetamine.[2] During the sentencing, the defendant objected to the PSIR's summary of relevant drug quantity amounts. More specifically, the defendant objected to the inclusion of methamphetamine amounts that could have been produced from a twenty-pound tank of anhydrous ammonia because the uncontroverted testimony produced at trial demonstrated that the tank leaked prior to being used to produce methamphetamine. Consequently, no methamphetamine was ever produced with the anhydrous ammonia. In addition, the defendant contended the PSIR incorporated duplicative quantities and incorrect quantities as testified to by the defendant's coconspirators. In contrast, the government argued the PSIR, as scored in its final form, accurately accounted for the defendant's relevant drug quantity amounts. Due to the nature of the issues, and a need to review the trial transcript in this proceeding, this court took the sentencing under

---

[1](...continued)
brothers' labs. These transactions usually occurred at the defendant and Judy Laue's shared residence. Both of the Storey brothers testified against the defendant. In addition, Jason Storey's girlfriend, Tammy McGrew, and Joel Storey's girlfriend, Lisa Van Ampting, assisted the Storey brothers with their methamphetamine operations and also testified against the defendant.

[2]The "actual" methamphetamine figure was arrived at based on a 49% purity level of 499.86 grams of methamphetamine mixture, as detailed by the PSIR.

advisement. The parties were allowed to file supplemental post-sentencing briefs. The defendant filed his brief on September 20, 2006 (Doc. No. 132), and the government thereafter filed its brief on September 28, 2006 (Doc. no. 136). After a thorough consideration of the parties' briefs and arguments presented both during and subsequent to the sentencing hearing, the court is now ready to fashion an appropriate sentence in this case.

## II. LEGAL ANALYSIS

The issues presented by Wendelsdorf's sentencing are both complex and varied. Accordingly, here the court will attempt to succinctly analyze the relevant sentencing issues and standards.

### A. *The Defendant's Base Offense Level*

Wendelsdorf's base offense level for the crime of Conspiracy to Manufacture and Distribute 5 grams or More of Actual Methamphetamine is determined pursuant to U.S.S.G. § 2D1.1. Pursuant to subsection (a)(3) of this Guideline, the defendant's base offense level is inextricably intertwined with the amount of controlled substance for which the defendant is found to be accountable by the sentencing court. The commentary to § 2D1.1 of the Sentencing Guidelines instructs that, in ascertaining a defendant's offense level, types and quantities of drugs not identified in the count of conviction may be considered by the court. More specifically, note 12 states:

> Types and quantities not specified in the count of conviction may be considered in determining the offense level. *See* § 1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the

4

> controlled substance. In making this determination, the court
> may consider, for example, the price generally obtained for the
> controlled substance, financial or other records, similar
> transactions in controlled substances by the defendant, and the
> size or capability of any laboratory involved.

U.S.S.G. § 2D1.1, cmt. 12 (2005).[3] The court's approximation should produce a "fair, accurate, and conservative estimate [ ] of the quantity of drugs attributable to a defendant" and should not be "merely speculative." *United States v. Zapata*, 139 F.3d 1355, 1359 (11th Cir. 1998) (marijuana conspiracy). The court may consider "evidence offered at sentencing to establish the amount of [a drug] that could have been produced by the defendants' conspiracy." *United States v. Carroll*, 6 F.3d 735, 742 (11th Cir. 1993) (methamphetamine conspiracy). However, as noted by numerous circuit courts, "'[W]hen choosing between a number of plausible estimates of drug quantity, none of which is more

---

[3] Section 1B1.3(a) in turn provides that the base offense level shall be determined on the basis of the following:

> (1) (A) all acts and omissions committed, aided,
> abetted, counseled, commanded, induced,
> procured, or willfully caused by the
> defendant; and
>
> (B) in the case of a jointly undertaken criminal
> activity . . . all reasonably foreseeable acts
> and omissions of others in furtherance of
> the jointly undertaken criminal activity,
>
> that occurred during the commission of the
> offense of conviction, in preparation for that
> offense, or in the course of attempting to avoid
> detection or responsibility for that offense . . . .

likely than not the correct quantity, a court must err on the side of caution.'" *United States v. Ortiz*, 993 F.2d 204, 208 (10th Cir. 1993) (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990); *see also United States v. Beler*, 20 F.3d 1428, 1433 n.2 (7th Cir. 1994) (noting the court's approximation of drug quantity must possess sufficient indicia of reliability); *United States v. Richards*, 27 F.3d 465, 469 (10th Cir. 1994) (noting a court must err on the side of caution when choosing between drug quantity estimates) *United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir. 1993) (stating that the need to estimate drug quantity "is not a license to calculate drug amounts by guesswork"). Within the Eighth Circuit, "[an appellate court] review[s] the district court's determination of drug quantities attributable to [the defendant] for clear error." *United States v. Granados*, 202 F.3d 1025, 1028 (8th Cir. 2000); *see United States v. Bewig*, 354 F.3d 731, 738 (8th Cir. 2003). "District courts determine the drug quantity attributable to the defendant by a preponderance of the evidence and make credibility decisions in the process." *United States v. Underwood*, 364 F.3d 956, 968 (8th Cir. 2004) (citing *United States v. Johnston*, 353 F.3d 617, 625 (8th Cir. 2003) (per curiam)). A district court's determination with respect to drug quantity will be reversed on appeal "only if the entire record definitely and firmly convinces [the appellate court] that a mistake has been made." *United States v. Sales*, 25 F.3d 709, 711 (8th Cir. 1994).

### B. Arguments Of The Parties

As mentioned previously in this court's discussion of the factual background of this case, the PSIR calculated the defendant's offense to be a level 34. This calculation includes the amounts that could have been yielded from the stolen, twenty-pound, anhydrous ammonia tank, had it not leaked. The parties disagree, however, as to whether the inclusion of the amounts that could have been hypothetically yielded from the tank are

properly included in the defendant's base offense level.

### 1. *The defendant's arguments for exclusion*

During the sentencing hearing, the defendant argued that the 350 grams of methamphetamine mixture that could have potentially been produced from the anhydrous ammonia in the tank should not be included in his base offense level. In support of this contention, the defendant first argues that the tank was allegedly procured sometime in the year 2000, and the indictment charges the conspiracy commenced in the year 2001. Thus, the defendant argues the acts associated with the tank are not relevant conduct and should not be considered. Moreover, the defendant points out that the uncontroverted testimony produced at trial was that the anhydrous was unusable because the tank leaked. Consequently, no methamphetamine was ever produced from the anhydrous ammonia contained in the tank as a result. The defendant argues that such "ghost methamphetamine," that is, methamphetamine that was intended to be produced but never developed, should not be included in his drug quantity calculation. Rather, the defendant contends that because it never actually produced any methamphetamine, the twenty-pound tank is irrelevant.

However, should the court determine the twenty-pound tank is relevant, the defendant argues in the alternative that the government has not met their burden of proof with respect to proving the amount of methamphetamine that could have been yielded from the tank. The defendant points out that the government failed to produce scientific evidence regarding how "full" the anhydrous tank was before the ammonia leaked. Rather, the government relied on the testimony of coconspirators at trial that the twenty-pound tank felt "full," but offered no conclusive evidence regarding how much ammonia was actually contained in the cylinder. In addition, the tank was never produced at trial because Joel Storey, upon realizing the tank leaked, disposed of the tank.

7

Further, the defendant points out that the theoretical yield that could have been produced from the tank was based on the testimony of Special Agent Todd Jones who was not qualified to express an opinion about laboratories, chemical reactions, quantities, conversions or the ability of an individual to take the twenty-pound tank of anhydrous ammonia and convert it into methamphetamine. Because Special Agent Jones was not a DEA chemist or similar expert in chemical operations, the defendant argues this provides an independent basis for the court to exclude the anhydrous ammonia tank from the defendant's total drug quantity calculation. Once the 350 grams of a methamphetamine mixture (171.5 grams actual) that the PSIR estimated could have been produced from the twenty-pound cylinder is excluded from his drug quantity calculation, the defendant argues his offense level is more properly scored as a level 26 based on 73.43 grams of actual methamphetamine.[4]

In his post-sentencing brief, the defendant also takes issue with a number of other quantities as calculated by the PSIR. First, Wendelsdorf contends the PSIR incorrectly states that Jason Storey testified that he traded one gram of methamphetamine for approximately 20 prescription pills with the defendant and Judy Laue, both together and separately, on 20-24 occasions. The defendant argues the trial transcript contradicts the PSIR and that Jason Storey's testimony was that he traded *one-half* of a gram of methamphetamine for the prescription pills. Further, the defendant contends the testimony produced at trial by his coconspirators was conflicting, and should therefore be disregarded

---

[4]The defendant's argument, unfortunately, is premised upon an incorrect reading of the applicable offense level for 73.43 grams of *methamphetamine (actual)*. The correct offense level for this amount of actual methamphetamine is level 32. *See* U.S.S.G. 2D1.1(c)(4). It is probable that the defendant's confusion stems from the fact that 73.43 grams of a *methamphetamine mixture* would yield an offense level of 26. *Compare id.*, *with* U.S.S.G. § 2D1.1(c)(7).

as being inherently unreliable. Thus, in conclusion, the defendant argues his base offense level is more appropriately scored at a level 20.

### 2. *The government's arguments for inclusion*

In contrast, the government contends the defendant's base offense level should be calculated as a level 34, in accordance with the final draft of the PSIR. With respect to the twenty-pound tank of anhydrous ammonia, the government asserts that the tank can be considered because it was part of the same course of conduct, common scheme or plan of the conspiracy, and therefore, constitutes relevant conduct. Although the acts with respect to the tank fell outside the time frame of the conspiracy as alleged in the Superseding Indictment, the government points out that it was the same scheme because it involved the same coconspirators and similar conduct, that is, trading precursors in exchange for methamphetamine. Accordingly, the government asserts the acts concerning the tank should be taken into consideration by the court as relevant conduct. The government further argues that the fact no methamphetamine was ever yielded from the tank is a non-issue. Rather, the government points out that it is well-established law that the quantity of drugs attributable to the defendant can be based upon precursor chemicals, including anhydrous ammonia. The government argues the agreement was that the twenty-pound tank would be turned into methamphetamine and that, as a result of that intent, the quantity that could have been yielded from the tank, regardless of the fact the tank leaked, can be included in the quantity of drugs attributable to the defendant.

## C. *Application To Defendant Wendelsdorf*
### 1. *The anhydrous ammonia tank*

The first issue the court must decide is whether the acts concerning the anhydrous ammonia tank constitute relevant conduct. If these acts do not constitute relevant conduct,

9

they are precluded from the court's calculation of drug quantity. However, if the acts with respect to the tank constitute relevant conduct, then the court must proceed to determine whether the quantity may properly be attributed to the defendant.

The testimony introduced at trial indicates that the tank, although outside the time frame of the conspiracy as charged by the Superseding Indictment, is indeed relevant conduct under U.S.S.G. § 1B1.3. While it is true that Joel Storey testified that he received the tank from the defendant around the year 2000, it is also true that both Jason and Joel Story testified that these actions involved themselves, the defendant and Judy Laue. Further, both Jason and Joel Storey testified that the agreement was to exchange the tank for methamphetamine. Thus, the Storey brothers' testimony reveals that the same coconspirators were involved in the same scheme of trading precursors for methamphetamine in close proximity to when the Superseding Indictment charges the conspiracy commenced. As a result, the acts with respect to the tank are properly within the purview of this court as relevant conduct. *See* U.S.S.G. § 1B1.3.

The next inquiry the court must make is whether the amount of methamphetamine that could have been yielded from the tank should be included in the defendant's drug quantity calculation when the uncontroverted evidence introduced at trial demonstrates that the anhydrous was unusable because the tank leaked. The relevant inquiry, with respect to determining unrecovered quantities of methamphetamine, "is not what a theoretical maximum yield would be, or even what an average methamphetamine cook would produce, but what [defendants] themselves could produce." *United States v. Anderson*, 236 F.3d 427, 430 (8th Cir. 2001) (citing *United States v. Cole*, 125 F.3d 654, 655 (8th Cir. 1997)); *see United States v. Eide*, 297 F.3d 701, 705 (8th Cir. 2002); *accord. United States v. Eschman*, 227 F.3d 886, 890-91 (7th Cir. 2000) (noting that estimates of drug production must be based on particularized facts related to the specific capabilities of the

10

defendant's individual drug laboratory); *United States v. Hamilton*, 81 F.3d 652, 654-55 (6th Cir. 1996) (same); *United States v. Mahaffey*, 53 F.3d 128, 132-33 (6th Cir. 1995) (same). As the Eighth Circuit has stated:

> Estimating the amount a clandestine lab is capable of manufacturing may be determined from the quantity of the precursor chemicals seized together with expert testimony about their conversion to methamphetamine. *United States v. Hunt*, 171 F.3d 1192, 1195-96 (8th Cir. 1999). Quantity yield figures should not be calculated without regard for the particular capabilities of a defendant and the drug manufacturing site. *See United States v. Anderson*, 236 F.3d 427, 430 (8th Cir.) (per curiam), *cert. denied*, 534 U.S. 956, 122 S. Ct. 356, 151 L. Ed. 2d 270 (2001) (evidence must be based not on theoretical yield but on what the particular defendant could produce); *United States v. Cole*, 125 F.3d 654, 655 (8th Cir. 1997) (relevant inquiry is on what the defendant, not "an average cook," is capable of yielding). *See also United States v. Eschman*, 227 F.3d 886, 890-91 (7th Cir. 2000) (estimates of drug production must be based on particularized facts related to the capabilities of an individual defendant's drug laboratory); *United States v. Hamilton*, 81 F.3d 652, 654-55 (6th Cir. 1996) (same); *United States v. Mahaffey*, 53 F.3d 128, 132-33 (6th Cir. 1995) (same).

*Eide*, 297 F.3d at 705. Stated differently, such drug quantity approximations should be "reasonably fair, accurate, and conservative, and not merely speculative." *United States v. Smith*, 240 F.3d 927, 931 (11th Cir. 2001) (citing *Zapata*, 139 F.3d at 1359). Further, the Guidelines indicate that approximation of drug quantity is controlled by, among other factors not relevant here, the amount of drugs the defendants are capable of producing. *See* U.S.S.G. § 2D1.1, cmt. n.12; *United States v. Stewart*, 361 F.3d 373, 381 (7th Cir. 2004) ("[O]nly the amount of finished product that could be produced from the raw materials would have been attributed to [the defendant] for sentencing."). Common sense

dictates that what the defendants are capable of producing is inextricably intertwined with the amount of *available* precursors. *See Smith*, 240 F.3d at 931 (citing *United States v. Hyde*, 977 F.2d 1436, 1440 (11th Cir. 1992)).

In this case, however, the uncontroverted testimony produced at trial revealed that the anhydrous ammonia allegedly contained in the tank was never technically "available" to Joel Storey because the tank leaked. Accordingly, the logical extension of this premise is that Joel Storey was never capable of producing the estimated amount of methamphetamine that could have been yielded from the tank. Therefore, the hypothetical, but unrealized, yield that could have been produced from the tank should be excluded from this court's determination based on the applicable case law and Guidelines. Although the government cites numerous cases in support of its contrary argument, these cases all contain fact patterns dissimilar to the one before this court—namely, in the sense that all of the relied-upon cases address situations in which the precursor chemicals that the quantity estimate was based upon were available to the defendants. *See United States v. Bertling*, 370 F.3d 818, 820 (8th Cir. 2004); *United States v. Benton*, 167 Fed. Appx. 157, No. 05-13024, 2006 WL 335638, at *2-3 (11th Cir. 2006). This court is unable, after exhaustive research, to find a single case in which an unavailable precursor was used to increase the defendant's drug quantity calculation. Accordingly, this court concludes that the anhydrous tank should be excluded from the defendant's drug quantity approximation.

This conclusion is bolstered by a separate note in the Guidelines dealing with a somewhat analogous situation, albeit in the context of agreements to sell controlled substances. In a separate paragraph, U.S.S.G. § 2D1.1 states as follows:

> In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance

12

> shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. For example, a defendant agrees to sell 500 grams cocaine, the transaction is completed by the delivery of the controlled substance—actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered more accurately reflects the scale of the offense.

U.S.S.G. § 2D1.1, cmt. n.12. By analogy, the defendant in this case had an agreement with his fellow coconspirators to, essentially, produce all the methamphetamine for which they could obtain the required ingredients. Although the agreement may at one time have encompassed the potential methamphetamine that could have been yielded from the anhydrous ammonia tank, the fact of the matter is that no methamphetamine was ever actually procured from the anhydrous in the tank. Thus, as in the example above, the amount actually produced, *not*, as the government contends, the agreed-upon amount, more accurately reflects the scale of the offense. Thus, although not precisely on point, the aforementioned example contained in the Guidelines notes fortifies the position of this court that the amount of "ghost methamphetamine" that could have been produced from the anhydrous tank is properly excluded from the defendant's drug quantity calculation.

However, assuming *arguendo* that the tank is properly included in the court's estimation, this court would still find that no quantity can be attributed to the defendant because the government failed to meet its burden of proof with respect to the amount of methamphetamine that could have been produced from the anhydrous in the tank. *See United States v. Plancarte-Vazquez*, 450 F.3d 848, 852 (8th Cir. 2006) ("'The government bears the burden of proving drug quantity by a preponderance of the evidence.'") (quoting *United States v. Marshall*, 411 F.3d 891, 894-95 (8th Cir. 2005)). This is so, because the government failed to produce reliable evidence as to not only how much methamphetamine

could be produced from the tank, but also how full the tank actually was when it was taken by the defendant. During trial, both of the Storey brothers testified that the tank was full of anhydrous. The government failed to elicit any testimony with respect to exactly how much anhydrous ammonia the tank actually contained or how the Storey brothers possessed any qualifications or knowledge to render an opinion that the tank was "full." "Estimating the amount a clandestine lab is capable of manufacturing may be determined from the quantity of the precursor chemicals seized together with expert testimony about their conversion to methamphetamine." *Eide*, 297 F.3d at 705 (citing *Hunt*, 171 F.3d at 1195-96). The testimony of the Storey brothers as to the fullness of the tank is insufficient to provide the court with a reliable basis from which to estimate drug quantity.

During the sentencing hearing, the government relied further upon the testimony of Special Agent Todd Jones. However, this court found during the sentencing hearing that Special Agent Jones was not qualified as an expert in chemistry and chemical reactions. Agent Jones testified he does not have a degree in chemistry or pharmacy and that he has never worked for the state lab. Agent Jones further revealed, under oath, that he had little understanding about the chemical reactions involved in methamphetamine manufacturing. Thus, as this court found at the sentencing, Agent Jones lacked foundation to testify with respect to these matters. It is well-established that a defendant's base offense level must be based on fair, accurate and conservative estimates of the quantity of drugs attributable to a defendant. *Smith*, 240 F.3d at 931 (citing *Zapata*, 139 F.3d at 1359). Accordingly, it would be improper for this court to base the defendant's offense level on Agent Jones's testimony because he was unqualified to proffer testimony on these matters.

  2. *Quantity attributed to the defendant by Jason Storey's testimony*

As mentioned elsewhere in this opinion, the defendant also contends the PSIR inappropriately inflates the quantity that can be attributed to him based on Jason Storey's

testimony with respect to the amount of methamphetamine that was traded in exchange for prescription pills from the defendant and Judy Laue. The PSIR indicates that Jason Storey testified he traded one gram of methamphetamine for approximately twenty pills with the defendant and Judy Laue on approximately 20-24 occasions. Thus, the PSIR holds the defendant accountable for 20 grams of methamphetamine mixture based on this premise. The government asserts this calculation is correct. However, a meticulous review of the trial transcript reveals Jason Storey testified as follows:

>Mr. Fairchild: And tell us a little more about the trade. What was traded for what?
>Jason Storey: It was--what it come to is it would be roughly a half gram would be traded for 20 prescription pills.
>Mr. Fairchild: Half gram of methamphetamine for 20 prescription pills.
>Jason Storey: Right.

Thus, it appears the PSIR inaccurately doubles the amount of methamphetamine that was actually made during these particular 20 trades. A defendant's base offense level must be based on fair, accurate and conservative estimates of the quantity of drugs attributable to a defendant. Accordingly, a defendant's sentence cannot be based on calculations of drug quantities that are merely speculative in nature. Along these same lines, a sentencing court is not permitted to "round up" the drug quantity attributed to the defendant. *See, e.g.*, *Zapata*, 139 F.3d at 1359 (reversing drug quantity determination because sentencing judge "rounded up"). Thus, it is readily apparent that the defendant's drug quantity, as it is reflected in the final PSIR, is improperly inflated. Based on Jason Storey's testimony, the defendant can only be held accountable for one-half of gram of a methamphetamine mixture with respect to these transactions, which results in a total of 10 grams of methamphetamine mixture.

However, upon a review of the trial transcript, it has also become apparent to the court that the PSIR incorrectly deflates the amount of methamphetamine attributed to the defendant by virtue of Lisa Van Ampting's testimony. The PSIR indicates that she testified she assisted Joel Storey with two cooks per month for 17 months and that each cook yielded between 3.5 grams and 7 grams of methamphetamine. The PSIR's quantification of this testimony utilizes the conservative 3.5 gram figure. However, this court's independent review of the trial transcript revealed that Van Ampting actually testified that each cook yielded 6-7 grams of methamphetamine. Thus, the total amount of methamphetamine that should have been reflected in the PSIR is 204 grams of a methamphetamine mixture, not 119 grams as paragraph 19 states. However, this court notes that these slight discrepancies between what was testified to at trial and the quantity identified in the PSIR are not great enough to have an affect on the defendant's total offense level. Accordingly, these conclusions are, in essence, distinctions without a difference, although they may have a slight impact on where the defendant is sentenced within the applicable Guidelines range.

### *3.    Unreliable testimony*

Finally, the defendant contends that the testimony of his coconspirators is unreliable because it is conflicting in various aspects. This court disagrees. "The court's inquiry upon sentencing is largely unlimited either as to the kind of information it may consider, or the source from which it may come." *See United States v. Mickelson*, 378 F.3d 810, 822 (8th Cir. 2004). "[T]he testimony of coconspirators is sufficient evidence on which the court may base the quantity of drugs used for sentencing." *Id.* (citing *United States v. Phillippi*, 911 F.2d 149, 151 n.3 (8th Cir. 1990)). While the defendant argues his coconspirators' testimony is unreliable, after a review of the entire trial transcript, this court is left with a firm conviction that the coconspirators' testimony has sufficient indicia

of reliability. The testimony introduced at trial was sufficiently corroborated by each of the coconspirators in numerous aspects with respect to the defendant's involvement in the drug conspiracy. While it is true that the coconspirators' testimony produced some discrepancy with respect to the amount of methamphetamine involved, the court, in accord with applicable case law has erred on the side of caution and utilized the most conservative estimate proffered by the defendants' coconspirators. *See Ortiz*, 993 F.2d at 204 ("'[W]hen choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.'") (quoting *Walton*, 908 F.2d at 1302). Accordingly, the defendant's argument, in this aspect, is without merit.

## III. CONCLUSION

Based on the foregoing discussion, the court finds that the defendant's drug quantity total is as follows:

| | |
|---|---|
| ¶ 14 of the PSIR: | .36 grams methamphetamine mixture |
| ¶ 16 of the PSIR: | 10 grams of methamphetamine mixture |
| | 1.5 grams of methamphetamine mixture |
| | 7 grams of methamphetamine mixture |
| ¶ 17 of the PSIR | 2 grams of methamphetamine mixture |
| ¶ 19 of the PSIR | 204 grams of methamphetamine mixture |
| **TOTAL**: | **224.86 grams of methamphetamine mixture**. |

Assuming the historic 49% purity level, as correctly calculated by the PSIR based on the evidence produced at trial, 224.86 grams of a methamphetamine mixture equates to 110.18 grams of methamphetamine actual. Pursuant to U.S.S.G. §§ 2D1.1(a)(3) and (c)(4),

17

either figure[5] places the defendant at an offense level of 32 with a criminal history category of I for an advisory guidelines sentence of 121-151 months.

**IT IS SO ORDERED.**

**DATED** this 1st day of November, 2006.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

---

[5]The Notes to the Drug Quantity Table encompassed within U.S.S.G. § 2D1.1(c) indicate that in the case of a mixture or substance containing methamphetamine, a court should "use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the . . . methamphetamine (actual), whichever is greater." *See* U.S.S.G. § 2D1.1 n.B. In this case, however, both calculations fall within the ranges dictated by offense level 32. *See* U.S.S.G. § 2D1.1(c)(4).